RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NADIM SHAKOURI HANNA,

　　　　　　　*Petitioner*,

　　*v.*

ERIC H. HOLDER, JR.,

　　　　　　　*Respondent.*

No. 12-4272

On Petition for Review of a Final Order of the
Board of Immigration Appeals.
No. A 46 737 768.

Argued: October 9, 2013

Decided and Filed: January 17, 2014

Before: MERRITT, GIBBONS, and McKEAGUE, Circuit Judges.

_____

### COUNSEL
_____

**ARGUED:** Faten Tina Shuker, LAW OFFICES OF FATEN TINA SHUKER, Farmington Hills, Michigan, for Petitioner.　James E. Grimes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Faten Tina Shuker, LAW OFFICES OF FATEN TINA SHUKER, Farmington Hills, Michigan, Russell Reid Abrutyn, MARSHAL E. HYMAN & ASSOC., PC, Troy, Michigan, for Petitioner.　James E. Grimes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

### OPINION
_____

　　JULIA SMITH GIBBONS, Circuit Judge.　Petitioner-appellant Nadim Shakouri Hanna petitions for review of an order of the Board of Immigration Appeals ("BIA"). Hanna was convicted of felonious assault under Mich. Comp. Laws § 750.82 and conceded removability through his first counsel.　Upon threat of removal from the

United States, Hanna applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") ordered Hanna removed and denied his applications for withholding of removal, and the BIA adopted and affirmed the IJ's decision. The BIA then reopened Hanna's asylum application based on changed conditions for Chaldean Christians in Iraq. On remand, Hanna, represented by new counsel, contested his removability and pursued claims for asylum and withholding of removal. The IJ granted Hanna's application for withholding of removal but held Hanna ineligible for asylum because he firmly resettled in Canada before entering the United States. The IJ also held that Hanna was bound to his first attorney's concession of removability. The BIA affirmed. On appeal to this Court, Hanna maintains that he is not removable and that the firm resettlement bar does not foreclose his asylum application. For the reasons set forth below, we grant Hanna's petition for review, reverse the BIA's holding that Hanna's admission is binding, and relieve Hanna of his attorney's concession of removability. Because the BIA's determination that Hanna is removable is predicated on this concession, we reverse the finding that Hanna is removable. We remand to the BIA to determine, consistent with this opinion, whether Hanna's specific offense under Mich. Comp. Laws § 750.82 is a crime involving moral turpitude. Separately, we affirm the BIA's determination that Hanna is ineligible for asylum.

## I.

Hanna, born on April 10, 1979, is a native and citizen of Iraq. Hanna and his family are Chaldean Christians. Hanna left Iraq in February 1990 with his father, mother, four sisters, and one brother. The family initially traveled to Greece, where they remained until December 1991. From there, they traveled onward to Canada and entered with "landed immigrant" status. As landed immigrants, Hanna and his family were considered permanent residents of Canada with permission to live and work. In 1993, Hanna's parents obtained permanent resident status in the United States through a petition filed by Hanna's sister, who previously had entered and obtained citizenship.

In May 1993, Hanna entered the United States as a nonimmigrant visitor. Hanna's parents petitioned for permanent resident status for their remaining children, including Hanna. While Hanna's petition was pending, he resided in Ontario, Canada, attending Catholic middle school there. Hanna also resided with his parents in the United States for significant amounts of time, sometimes the majority of the year, as a nonimmigrant visitor. By traveling to and from Canada and overstaying the visitor's visas he received upon entering the United States, Hanna attended high school in the United States, worked at the family business, and obtained a Michigan driver's license. During this time, Hanna retained his landed immigrant status in Canada. Hanna was admitted as a lawful permanent resident to the United States on November 17, 1998. Subsequently, Hanna's Canadian permanent resident status expired. *See* Immigration and Refugee Protection Act of Canada, S.C. 2001, c. 27, §§ 28, 41(b) (Can.).

On November 28, 1996, Hanna, then seventeen years old, was cruising in a parking lot in Southfield, Michigan, while waiting for friends who were attending a nearby party. The attendant valet, Johny Asmer, told Hanna to stop cruising. Ensuing words were exchanged, which escalated into shouting. While exiting the parking lot in his car, Hanna, holding an opened, three-inch, folding knife, threatened to cut Asmer. Hanna was arrested as a result of this incident, but the charges were twice dropped after Asmer failed to appear in court. In 1999, however, the State of Michigan reinstated the charges from the parking lot altercation. Hanna was charged with felonious assault, in violation of Mich. Comp. Laws § 750.82, and driving with a suspended license. On March 31, 2000, the Sixth Judicial Circuit Court for Oakland County, Michigan, a Michigan trial court, found that Hanna committed these offenses after his seventeenth but before his twenty-first birthday. The Michigan court assigned Hanna to Youthful Trainee Status and sentenced him to thirty days in the county jail and two years of probation. As result of the court order, the government commenced removal proceedings against Hanna by filing of a Notice to Appear ("NTA"), dated January 8, 2002. The government alleged in the NTA that Hanna was convicted on March 31, 2000, for the offense of felonious assault, committed on or about November 28, 1996, and, for that offense, a sentence of one year or longer may be imposed. The government

subsequently filed a Form I-261, specifically charging Hanna with an admission date of May 1993 as a nonimmigrant visitor. The government charged Hanna as subject to removal, having been convicted of a crime involving moral turpitude ("CIMT") within five years after admission and for which a sentence of one year or longer may be imposed. *See* 8 U.S.C. § 1227(a)(2)(A)(i).

Removal proceedings were conducted on April 18, 2003, July 25, 2003, and November 9, 2005, at the Immigration Court in Detroit. Hanna was initially represented by his attorney, Nasir Daman. On April 18, 2003, the Michigan court order was admitted into evidence as a record of Hanna's conviction for felonious assault. Then, on July 25, 2003, Hanna, through his counsel, admitted the charges in the NTA, including the factual allegation that Hanna was convicted of the offense of felonious assault. Hanna, through his counsel, also conceded his removability under 8 U.S.C. § 1227(a)(2)(A)(i). The IJ designated Iraq as the country of removal. Further, at the July 25 hearing, Hanna filed I-589 applications for asylum and for withholding of removal under the INA and protection under the CAT. Hanna's withholding application was supported by his claim that being a Chaldean Christian placed him at risk of harm in Iraq. At the November 9 hearing, Hanna conceded ineligibility for asylum resulting from his failure to file an asylum application within one year of entering the United States. *See* 8 U.S.C. § 1158(a)(2)(B). Hanna and his father then testified in support of his application for withholding of removal, averring that Hanna would be subject to grave danger if removed to Iraq. The IJ denied Hanna's applications for relief and ordered Hanna removed to Iraq, with an alternative to Canada, on the charge contained in the NTA.

Hanna appealed the IJ's denial of asylum and withholding of removal. On May 30, 2007, the BIA adopted and affirmed the IJ's decision and declined to remand. Hanna subsequently moved to reopen removal proceedings on April 28, 2008, contending entitlement to reopening under the Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110–181, tit. XII, submit. C, § 1247, 122 Stat. 3 (2008) (codified at 8 U.S.C. § 1157), because conditions in Iraq had deteriorated for Chaldean Christians. The BIA granted

this motion on October 30, 2008, finding Hanna produced previously unavailable evidence of significantly worsening conditions in Iraq for its minority Christian populations. The BIA reopened to allow Hanna to apply for asylum based on his status as a Chaldean Christian and remanded to the IJ. Hanna reapplied for asylum on May 3, 2010.

After this point, Hanna was represented by Faten Tina Shuker. Continued removal proceedings were conducted on January 8, 2009, May 3, 2010, and October 26, 2010. On remand, Hanna presented several hundred pages of documentary evidence, and Hanna and his father testified in support of his applications. The hearings focused on three issues: whether Hanna's conviction was for a particularly serious crime sufficient to preclude relief; whether Hanna merited asylum as a matter of discretion; and whether Hanna firmly resettled in Canada before immigrating to the United States. Hanna also raised the issue of his removability.

The IJ entered her decision on October 26, 2010. The IJ found Hanna and his father credible with respect to a well-founded fear of Hanna's future persecution as a Chaldean Christian and held that Hanna's offense of conviction was not a particularly serious crime. The IJ accordingly granted Hanna's application for withholding of removal under 8 U.S.C. § 1231(b)(3) and held Hanna's claim for protection under the CAT moot. With respect to asylum, the IJ noted that an alien who "firmly resettled" in another country before arriving in the United States is not eligible for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 1208.13(c)(2)(ii). The IJ held that the government proffered sufficient evidence showing Hanna "firmly resettled" in Canada, that Hanna failed to provide evidence sufficient to rebut this contention, and that Hanna is statutorily ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(vi). As to removability, the IJ noted that Hanna, through counsel, previously admitted all the factual allegations contained within the NTA and conceded the charge of removability. The IJ therefore held that Hanna's removability was established by the requisite clear and convincing evidence.

Hanna again appealed to the BIA, arguing that the IJ improperly placed the burden on him to show that he had not firmly resettled and that the firm resettlement bar did not apply because he entered the United States as an immigrant, not as a refugee in flight from persecution. In the alternative, Hanna argued that the IJ erred in finding him removable since the Michigan statute of felonious assault encompasses CIMT and non-CIMT offenses and his specific offense is not a CIMT. Hanna subsequently filed a separate motion to remand and terminate, arguing that his conviction had been vacated and that his case had been set for a new trial. Hanna later withdrew this motion after the Michigan Court of Appeals reinstated his conviction. *See People v. Hanna*, No. 304798, 2012 WL 833294 (Mich. Ct. App. Mar. 13, 2012).

The BIA dismissed Hanna's appeal on September 27, 2012. The BIA adopted and affirmed the IJ's determination that the government presented *prima facie* evidence that Hanna had an offer of firm resettlement before entering the United States. The BIA held that, once the government met its initial burden, the burden shifted to Hanna to establish an exception under 8 C.F.R. § 1208.15(a) or (b) and that Hanna had not successfully rebutted the government's firm resettlement showing. Further, the BIA rejected Hanna's claim that he is not subject to the firm resettlement bar because his application for asylum is based on changed country conditions occurring after his admission to the United States. The BIA found that Hanna's circumstance fits the plain language of 8 U.S.C. § 1158(b)(2)(A)(vi) and noted the absence of any language indicating that firm resettlement must be a consequence of fleeing persecution. The BIA also noted that an alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered another country with, or while in that country received, an offer of permanent resident status. *See* 8 C.F.R. § 1208.15. The BIA further found that there is no temporal limitation or other indication that the resettlement must be preceded by flight from persecution. As to Hanna's removability, the BIA held Hanna's July 2003 concession of removability through counsel was binding. The BIA considered the issue of Hanna's removability resolved. Hanna filed a timely petition for review.

II.

This Court has "jurisdiction to review questions of law and constitutional claims" arising from "'removal orders of petitioners deemed removable for having committed a [crime involving moral turpitude].'" *Yeremin v. Holder*, 707 F.3d 616, 621 (6th Cir. 2013) (alteration in original) (quoting *Ruiz-Lopez v. Holder*, 682 F.3d 513, 516 (6th Cir. 2012)). "We review the BIA's conclusions of law *de novo*." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (citing *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004)). The determination of whether a conviction under a particular statute qualifies as a crime involving moral turpitude is a question of law and thus is also subject to judicial review. *Yeremin*, 707 F.3d at 621. "The BIA's construction of ambiguous statutory provisions—such as the term 'crime involving moral turpitude'—is generally entitled to *Chevron* deference." *Ruiz-Lopez*, 682 F.3d at 516 (citing *Kellermann v. Holder*, 592 F.3d 700, 702–03 (6th Cir. 2010)). "No deference is given, however, to the BIA's interpretation of a state criminal statute; that issue is reviewed de novo." *Id.* (quoting *Serrato–Soto v. Holder*, 570 F.3d 686, 688 (6th Cir. 2009)).

This court also has jurisdiction to review the final decision of the BIA "affirming the IJ's denial of asylum." *Singh v. Ashcroft,* 398 F.3d 396, 400 (6th Cir. 2005). "In considering a petition for review of a decision of the Board of Immigration Appeals, we review the Board's legal determinations de novo and its factual findings under the substantial evidence standard." *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005) (internal citations omitted). "In reviewing the factual determinations of the Board regarding an alien's eligibility for asylum and withholding of deportation, this court must apply the substantial evidence standard of review." *Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992); *see also Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir. 2006) (en banc) ("A finding of 'firm resettlement' is a factual determination that we review under the deferential substantial evidence standard."). The substantial evidence standard requires this court to uphold the Board's findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992); *see also Klawitter*, 970 F.2d at 151–52.

"'To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the alien alleged.'" *Mostafa*, 395 F.3d at 624 (quoting *Rhodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003)).  Where the BIA "did not summarily affirm or adopt the IJ's reasoning and provided an explanation for its decision," this Court "review[s] the BIA's decision as the final agency determination." *Ilic-Lee v. Mukasey,* 507 F.3d 1044, 1047 (6th Cir. 2007).  "Where the Board adopts the IJ's decision and supplements that decision with its own comments, as in this case, we review both the BIA's and the IJ's opinions." *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011).

Hanna argues that he is not removable because his adjudication under Michigan's Holmes Youthful Trainee Act ("YTA"), Mich. Comp. Laws §§ 762.11–16, is neither a "conviction" under the INA, nor a crime involving moral turpitude ("CIMT").  Hanna acknowledges that in *Uritsky v. Gonzales*, 399 F.3d 728, 735 (6th Cir. 2005), this court determined that YTA adjudications are "convictions" under the INA, 8 U.S.C. § 1101(a)(48)(A).  Hanna contends, however, that this Court should reexamine *Uritsky* in light of three subsequent Supreme Court decisions: *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012); *Judulang v. Holder*, 132 S. Ct. 476 (2011); and *Padilla v. Kentucky*, 559 U.S. 356, 366–71 (2010).  Hanna also contends that YTA adjudications are analogous to determinations of juvenile delinquency under the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. §§ 5031–42, and, like FJDA delinquency determinations, should not be considered "convictions" under the INA.

Alternatively, Hanna contends that his offense is not a CIMT, that the government has the burden to prove otherwise, and that the government cannot meet this burden.  Hanna argues that Michigan's felonious assault statute, Mich. Comp. Laws § 750.82, is divisible, encompassing both CIMT and non-CIMT offenses.  Relying on *Singh v. Holder*, 321 F. App'x 473, 478–80 (6th Cir. 2009), Hanna argues that his particular offense is not a CIMT and, hence, does not trigger removability under 8 U.S.C. § 1227(a)(2)(A)(i).  We find that Hanna presented this claim to the BIA, and thus

we may review it here.  *See* 8 U.S.C. § 1252(d)(1); *Gor v. Holder*, 607 F.3d 180, 185 (6th Cir. 2010).

The government responds that Hanna's removability is established by his concessions, through his first counsel, of the factual allegations contained in the NTA and of removability at the July 25, 2003 hearing.  According to the government, by conceding removability, Hanna conceded that he is removable for having been convicted of a CIMT.  The government contends that this concession is a binding judicial admission sufficient to establish Hanna's removability and that the concession forecloses Hanna's challenges to removability.

Separate from the issue of his removability, Hanna argues that he is eligible for asylum.  The government responds that Hanna is ineligible for asylum under the firm resettlement bar, 8 U.S.C. § 1158(b)(2)(A)(vi).  Hanna rejoins that he qualifies for an exception to the firm resettlement bar under 8 C.F.R. § 1208.15.  The government denies that Hanna falls within any such exception.

A.

In a removal proceeding, "petitioners are bound by the concessions of their attorneys to the IJ unless they can show ineffective assistance of counsel or some other egregious circumstances." *Gill v. Gonzales*, 127 F. App'x 860, 862–63 (6th Cir. 2005); *see also Magallanes-Damian v. INS,* 783 F.2d 931, 934 (9th Cir. 1986) ("Petitioners are generally bound by the conduct of their attorneys, including admissions made by them, absent egregious circumstances."); *In re Velasquez,* 19 I. & N. Dec. 377, 382 (BIA 1986) ("Absent egregious circumstances, a distinct and formal admission made before, during, or even after a proceeding by an attorney acting in his professional capacity binds his client as a judicial admission.").  This court has yet to clarify those egregious circumstances sufficient to relieve an alien of his counsel's prejudicial admissions.  The BIA, however, clarified the meaning of "egregious circumstances" in *Velasquez.  See* 19 I. & N. Dec. at 383.  Building on *Velasquez*, other federal courts of appeals have developed a framework to determine egregious circumstances.  *See, e.g.*, *Santiago-*

*Rodriguez v. Holder*, 657 F.3d 820, 831–36 (9th Cir. 2011); *Hoodho v. Holder*, 558 F.3d 184, 192 (2d Cir. 2009).

As a threshold matter, to establish egregious circumstances, an alien must argue "that the factual admissions or concessions of [removability] were untrue or incorrect." *Velasquez*, 19 I. & N. Dec. at 383; *see*, *e.g.*, *Mai v. Gonzales*, 473 F.3d 162, 167 (5th Cir. 2006) (reversing BIA's denial of a motion to reopen, where alien's prior attorney had admitted NTA's factual allegations that alien "strongly denied"); *cf. Roman v. Mukasey,* 553 F.3d 184, 187 (2d Cir. 2009) (rejecting that the government must submit evidence of an alien's prior conviction because the alien "does not allege that the admissions were inaccurate"); *Torres-Chavez v. Holder,* 567 F.3d 1096, 1102 (9th Cir. 2009) (refusing to permit alien to withdraw attorney's tactical decision to admit alienage because attorney "simply conceded that [client] was an alien, a fact that [client] has never suggested is untrue"). Further, an alien's argument that his attorney's concessions were incorrect must be supported by record evidence. *See*, *e.g.*, *Hulse v. Holder*, 480 F. App'x 23, 26 (2d Cir. 2012) (denying petition for review of BIA decision denying withholding of removal because admission of procuring benefit by entering into fraudulent marriage was "not contradicted by the record evidence"); *Hoodho*, 558 F.3d at 192 (denying petition for review of BIA decision because "[w]here, as here, an IJ accepts a concession of removability from retained counsel and that concession is not contradicted by the record evidence, the circumstances are not 'egregious' in any respect").

Where an alien has argued that his or her counsel's admission is incorrect and that argument is supported by the record, two types of egregious circumstances justify relieving the alien of his or her counsel's prejudicial admissions. The first circumstance concerns admissions that "were the result of unreasonable professional judgment." *Velasquez,* 19 I. & N. Dec. at 383; *see also Santiago-Rodriguez*, 657 F.3d at 834–36 (holding that BIA erred in not permitting alien to withdraw attorney's admission where such admission was made without any factual basis and constituted deficient performance); *In re Morales-Bribiesca,* No. A047 770 293, 2010 WL 4500889, at *2

(BIA Oct. 18, 2010) ("[T]he respondent's prior attorney admitted that she conceded the respondent's removability [for alien smuggling] without first speaking to the respondent or discussing the factual allegations with the respondent . . . [and] given the egregiousness of the representation, we do not deem the attorney's admission binding on the respondent." (citing *Velasquez,* 19 I. & N. Dec. at 382)); *In re Shafiee,* No. A24 107 368, 2007 WL 1168488, at *1 (BIA Mar. 2, 2007) (granting motion to reopen and holding that attorney's concession of removability based on alien's "insistence on expediting a case is no excuse for failing to research and advise a client that there is no sound basis for the charges").

The second circumstance in which an alien should be relieved of an admission of counsel is if binding the alien to that admission would "produce[ ] an unjust result." *Velasquez,* 19 I. & N. Dec. at 383. An inadvertent admission would fall into this category. *See, e.g., Ali v. Reno,* 829 F. Supp. 1415, 1425 (S.D.N.Y. 1993) (holding, in *habeas corpus* proceeding reviewing the rescission of permanent resident status, that alien could not withdraw the prior concessions of counsel because "there has been no showing that counsel's concessions regarding rescission and excludability were inadvertent, unfair or extraordinary"), *aff'd*, 22 F.3d 442 (2d Cir. 1994); *cf. Cortez-Pineda v. Holder,* 610 F.3d 1118, 1122 n.2 (9th Cir. 2010) (refusing to bind the government to a mistaken factual assertion regarding the alien's entry date). So too would a circumstance "where the propriety of an admission or concession has been undercut by an intervening change in law." *In re Chavez-Mendoza,* No. A90 542 948, 2005 WL 649052, at, *1 n.3 (BIA Feb. 2, 2005); *see, e.g.*, *Santiago-Rodriguez,* 657 F.3d at 833 ("Binding [petitioner] to the admission that he smuggled his brother . . . even after [an intervening change in the law] would 'produce[ ] an unjust result,' if [petitioner] can make a prima facie showing that his actions would not constitute smuggling under the clarified, correct interpretation of the smuggling statute." (quoting *Velasquez*, 19 I. & N. Dec. at 383)); *Huerta-Guevara v. Ashcroft,* 321 F.3d 883, 886 (9th Cir. 2003) (permitting alien to challenge removability despite concession because intervening change in law meant alien was not removable).

Applying this framework, we relieve Hanna of his attorney's July 25, 2003, concession of removability. Hanna satisfies the threshold requirements for challenging the binding effect of the prior admission: Hanna has contended and maintains the concession of removability is incorrect because his crime did not involve moral turpitude, and there is record evidence to support his position. Neither the charging documents nor the record of conviction suggest that Hanna necessarily pled to facts establishing that his offense is a CIMT. *Cf. Wala v. Mukasey*, 511 F.3d 102, 108 (2d Cir. 2007) (vacating BIA's removal order because petitioner was not required to plead facts establishing intent to commit a CIMT nor did his plea colloquy establish otherwise). Other evidence in the record that an immigration court may consider suggests that Hanna's specific offense was not a CIMT. *See Kellermann*, 592 F.3d at 704 (noting that if "the court finds that the statute of conviction criminalizes both conduct that does and does not qualify as a CIMT, then the court should apply a more modified approach" (citing *In re Silva-Trevino,* 24 I. & N. Dec. 687, 690 (A.G. 2008) (directing IJs to consider any additional evidence deemed necessary to resolve accurately whether an offense is a CIMT if the record of conviction is inconclusive))). For instance, on remanded proceedings to determine whether to grant Hanna withholding of removal from Iraq, the IJ made findings suggesting Hanna's offense "fall[s] within the apprehension-portion of the statute [that] would plainly stretch the concept of a CIMT." *See Singh*, 321 F. App'x at 480. After reviewing the record for the severity of the offense, the IJ found that Hanna credibly testified that he was never in close proximity of the individual and had no intention of attacking him. Further, the IJ held that Hanna's offense was not particularly serious and noted that it could not find Hanna was or is a danger to the community.

Turning to the egregious circumstances under which an alien may be relieved of a prior admission through counsel, the propriety of Hanna's concession has been undercut by an intervening change in law "produc[ing] an unjust result" if Hanna is bound to the admission. *See Velasquez,* 19 I. & N. Dec. at 383. In *Singh*, the court found that the Michigan statute under which Hanna was convicted, Mich. Comp. Laws § 750.82, is likely divisible. 321 F. App'x at 479–80. Under this statute,

a person who assaults another person with a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both.

Mich. Comp. Laws § 750.82(1).  In *Singh*, the court analyzed this statute in detail:

The elements of this crime, as interpreted by Michigan courts, are: (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable fear or apprehension of an immediate battery.  *People v. Lawton,* 196 Mich. App. 341, 492 N.W.2d 810, 815 (1992).  . . . The statute requires one of two unlawful intents: either an intent to injure (i.e., an attempted battery) or an intent to place the victim in apprehension of an immediate battery.  In *People v. Reeves,* 458 Mich. 236, 580 N.W.2d 433, 436–37 (1998), the Michigan Supreme Court explained that these two types of assault have different mental elements, noting that, at early common law, only the attempted-battery variety of assault was criminalized.

*Singh*, 321 F. App'x  at 478.  The *Singh* court reasoned that "[b]ecause the Michigan statute essentially encompasses two distinct offenses—assault with intent to harm, and assault with intent merely to cause apprehension of harm[,] we must determine whether both constitute CIMTs."  *Id.* at 479.  As the BIA had neither addressed whether Mich. Comp. Laws § 750.82 is divisible nor considered the circumstances under which assault crimes are CIMTs, the *Singh* court analyzed the Michigan statute for divisibility:

The apprehension variety of assault is less morally turpitudinous than the attempted-battery variety, as it requires no intention to physically harm another person. This is apparent from a simple example: Under the Michigan statute, holding a baseball bat as if to strike someone with it (with the intention of placing that person in fear of being struck by the bat), and actually swinging the bat in a failed attempt to strike the person both satisfy the statute, but the latter is clearly more inherently base, vile, or depraved, and contrary to the accepted rules of morality than the former. We can imagine a range of factual circumstances that would fall within the apprehension-portion of the statute but would plainly stretch the concept of a CIMT.

*Id.* at 479–80 (internal citations and quotation marks omitted).  Because the *Singh* court found Mich. Comp. Laws § 750.82 likely divisible and because the BIA had not

considered the distinction between offenses of assault with the intention to physically harm another and offenses of assault with the intention to cause apprehension of harm, the *Singh* court remanded the case for the BIA to determine whether "Singh's assault conviction under the particular Michigan statute is not a CIMT." *Id.* at 480. On remand, the BIA treated Mich. Comp. Laws § 750.82 as divisible and remanded to the IJ "to make relevant findings of fact and enter a legal determination on the issue of whether the respondent's convictions for assault in violation of [the statute] . . . qualify as crimes involving moral turpitude in the first instance that is consistent with the Sixth Circuit's decision described above." *In re Singh*, No. A092 407 108 (BIA Oct. 19, 2009) (unpub.) (citing *Silva-Trevino*, 24 I. & N. Dec. 687).

There has been "an intervening change in law" since Hanna's attorney's 2003 concession of removability. *Chavez-Mendoza*, 2005 WL 649052, at *1 n.3. We now recognize Mich. Comp. Laws § 750.82 as divisible, and, as such, the statute encompasses non-CIMT offenses. Binding Hanna to his 2003 admission—where there has been an intervening change in the law as to the divisibility of his statute of conviction, where Hanna argues that is offense is not a CIMT, and where his argument is supported by record evidence that an immigration court may consider—would "produce[] an unjust result." *Velasquez*, 19 I. & N. Dec. at 383; *see also Santiago-Rodriguez*, 657 F.3d at 833; *Huerta-Guevara*, 321 F.3d at 886. Accordingly, we relieve Hanna of his attorney's July 25, 2003, concession that he is removable, and we reverse the BIA's holding that this concession is binding. Because the BIA's determination that Hanna is removable is predicated upon this concession of removability, we reverse that determination.

## B.

Since Hanna is not bound by his attorney's 2003 concession of removability, we now address Hanna's arguments that he is not removable. First, Hanna argues that he is not removable because his YTA adjudication is not a "conviction" under 8 U.S.C. § 1101(a)(48)(A). This contention is unavailing. The INA defines "conviction" as follows:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
>
> > (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A). Hanna's disposition under the YTA satisfies both conditions.

We have already determined that YTA adjudications are convictions under the INA. *See Uritsky v. Gonzales*, 399 F.3d 728, 735 (6th Cir. 2005) (holding "the Board's conclusion that youthful trainee designations in Michigan represent convictions for immigration purposes represents the kind of 'permissible construction' of the INA sanctioned by *Chevron*"). Contrary to Hanna's contentions, neither *Padilla*, 559 U.S. at 366–71, *Lafler*, 132 S. Ct. at 1385, nor *Judulang*, 132 S. Ct. at 485 provides grounds to reexamine the holding of *Uritsky*.

In *Padilla*, the Supreme Court held that an attorney's failure to advise a defendant-client regarding the immigration consequences of a guilty plea constitutes deficient performance where the consequences of the defendant's guilty plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect. 559 U.S. at 368–69. In *Lafler*, the Court held that the petitioner was prejudiced by his counsel's deficient performance in advising petitioner to reject a plea offer and proceed to trial. 132 S. Ct. at 1391. The *Lafler* court held the "Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding," including plea negotiations, *id.* at 1385, and "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it," *id.* at 1387. Neither *Padilla* nor *Lafler* bears on whether YTA adjudications are "convictions" under the INA. Nor has Hanna made a claim for ineffective assistance of counsel and, therefore, neither decision informs our determination.

In *Judulang*, the Supreme Court held that the BIA's "comparable-grounds" test to determine eligibility for discretionary relief under 8 U.S.C. § 1182(c) (repealed 1996) is "arbitrary and capricious" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). 132 S. Ct. at 483–84. The Court's holding in *Judulang* does not bear upon the permissible interpretations of "conviction" under 8 U.S.C. § 1101(a)(48)(A). Hanna principally relies on *Judulang* as an example of the Court's setting aside a BIA decision as "arbitrary and capricious" under the APA. The crux of Hanna's contention is that the BIA's method of determining whether state youthful offender dispositions are "convictions" under 8 U.S.C. § 1101(a)(48)(A) is arbitrary and capricious. Hanna suggests the distinction drawn by the BIA in *In re Uritsky*, No. A78 652 707, 2003 WL 23216944, at *2 (BIA Oct. 6, 2003), between, on the one hand, findings of juvenile delinquency—including adjudications of youthful offender status pursuant to N.Y. Crim. Pro. Law § 720 and determinations of juvenile delinquency under the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042 (1994 & Supp. II 1996) ("FJDA")—which *are not* "convictions," and, on the other hand, proceedings akin to expungement or deferred adjudications—including Michigan's YTA adjudications—which *are* "convictions," is arbitrary and capricious.

Our opinion in *Uritsky* forecloses Hanna's suggestion based on *Judulang*. In *Uritsky*, applying principles of *Chevron* deference, *see Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), we upheld the BIA's conclusion that Michigan YTA adjudications are convictions, thus implicitly deciding that the BIA conclusion was neither arbitrary nor capricious. *See Uritsky*, 399 F.3d at 735. *Uritsky* binds us here.

## C.

Focusing on his November 1996 assault, Hanna argues that because he merely intended to place the victim in apprehension of an immediate battery, his conviction under Mich. Comp. Laws § 750.82 was not for a CIMT and, therefore, he is not removable. There may well be merit to Hanna's argument. Mich. Comp. Laws § 750.82 is a divisible statute, encompassing offenses that are and are not CIMTs. Although it is

not dispositive, Hanna's record of conviction does not suggest facts qualifying his offense as a CIMT. *Cf. Wala*, 511 F.3d at 109 (holding BIA erred in finding petitioner removable because petitioner, convicted under a divisible statute, did not necessarily plead to facts qualifying his particular offense as a CIMT). In our review of the record, we find nothing suggesting that Hanna's November 1996 assault necessarily involved the intent to injure as opposed to the intent to place the victim in apprehension of an immediate battery. Our conclusion is supported by *Singh*, which declined to hold that a much more egregious conviction under Mich. Comp. Laws § 750.82 was a CIMT. In *Singh*, the petitioner, Gurminder Singh, was convicted under the Michigan statute for an assault based on the following events:

> Singh and an acquaintance were arguing while driving in a pickup truck after an evening of consuming alcohol; they came to blows, and the acquaintance fell from the moving vehicle; Singh and his cousin, who was also in the truck, continued driving and left the acquaintance—the vehicle's owner—on the road. Singh was charged with kidnapping, car-jacking, and attempted murder but pleaded guilty to felonious assault with a dangerous weapon.

*Singh*, 321 F. App'x at 475–476. After finding Mich. Comp. Laws § 750.82 likely divisible, the court remanded to the BIA to determine whether Singh's assault conviction is a CIMT. Hanna and Singh were convicted under the same statute. Based on these facts, Hanna's offense appears not only significantly less egregious than Singh's offense but also may well "fall within the apprehension-portion of the statute [that] would plainly stretch the concept of a CIMT." *Singh*, 321 F. App'x at 480.

We recognize, however, that given the previous exclusive focus on Hanna's attorney's 2003 concession of removability, the immigration courts have yet to consider the substantive merits of Hanna's claim that he is not removable because his offense is not a CIMT. Although the IJ held—when making its determination to grant Hanna withholding of removal to Iraq—that Hanna's offense was not particularly serious and that Hanna was not a threat to the community, the immigration courts have yet to consider directly whether Hanna's underlying offense is a CIMT. The immigration courts should have the opportunity to review the record and to determine this precise

issue. *See Kellermann*, 592 F.3d at 704 (providing a framework to determine whether an offense under a divisible statute is a CIMT); *Singh*, 321 F. App'x at 480 (remanding for BIA to determine whether felonious assault conviction under Mich. Comp. Laws § 750.82 is a CIMT); *see also Garcia-Meza v. Mukasey,* 516 F.3d 535, 537–38 (7th Cir. 2008) (remanding for reconsideration where BIA mistakenly read a bodily-injury requirement into a state assault statute). Therefore, we remand to the BIA so that it may consider whether Hanna's Michigan offense is a CIMT.

## III.

We now turn to the separate issue of Hanna's eligibility for asylum. "Any alien"—any person not a citizen or national of the United States—"who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum . . . ." 8 U.S.C. § 1158(a)(1). An alien is ineligible for asylum, however, if "the alien was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi); *see also Rosenberg v. Woo,* 402 U.S. 49, 56 (1971) (holding that the presence of firm resettlement constituted a factor for consideration in asylum petitions). Immigration regulations further provide that "[a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 1208.15 (2000); *see also Ali v. Reno*, 237 F.3d 591, 595 (6th Cir. 2001) (affirming BIA's ruling that asylum applicant had firmly resettled in Denmark because applicant received a Danish passport and residence permit). An alien is not considered to be firmly resettled, however, if he or she establishes:

> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the

conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 1208.15(a)–(b).

In determining firm resettlement, the BIA applies "a four-step analysis, which follows the language of the regulations at 8 C.F.R. § 1208.15 and focuses exclusively on the existence of an offer." *In re A-G-G-*, 25 I. & N. Dec. 486, 503 (BIA 2011). "In the first step of the analysis, the DHS bears the burden of presenting prima facie evidence of an offer of firm resettlement." *Id.* at 501. "In the second step of . . . [this] framework, the alien can rebut the DHS's prima facie evidence of an offer of firm resettlement by showing by a preponderance of the evidence that such an offer has not, in fact, been made or that he or she would not qualify for it." *Id.* "In the third step, the Immigration Judge will consider the totality of the evidence presented by the parties to determine whether an alien has rebutted the DHS's evidence of an offer of firm resettlement." *Id.* "In the final step, if the Immigration Judge finds the alien firmly resettled, the burden then shifts to the alien pursuant to 8 C.F.R. §§ 1208.15(a) and (b) to establish that an exception to firm resettlement applies by a preponderance of the evidence." *Id.*

We have not expressly adopted this four-step framework to determine firm resettlement. *See Thiam v. Holder*, 677 F.3d 299, 303 (6th Cir. 2012). In *Thiam*, we found that since "the BIA did not follow its own framework for firm-resettlement determinations" it "remand[ed] the case to the BIA to let it determine how to consider the record in light of its framework." *Id.* at 303. We also paranthetically noted that "[i]n giving the BIA the first crack, of course, we are not taking a position on the extent to which the *A-G-G-* framework is consistent with the law." *Id.* We have held, however, that we "must defer to the agency's interpretation of its own regulations unless the text is unambiguous or the agency's interpretation is 'plainly erroneous or inconsistent with

the regulation.'" *Intermodel Techs, Inc. v. Peters*, 549 F.3d 1029, 1031 (6th Cir. 2008) (quoting *Ky. Waterways Alliance v. Johnson*, 540 F. 3d 466, 474–75 (6th Cir. 2008)); *see also Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) ("When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'") (quoting *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011))).

Turning to the arguments, Hanna first contends that, within the context of the BIA's framework, the government did not offer *prima facie* evidence that Hanna was firmly resettled in Canada. The government counters that both Hanna and his father testified that Hanna was granted landed immigrant status in Canada, and that such testimony constitutes *prima facie* evidence of firm resettlement. Applying the burden-shifting framework, the testimony is *prima facie* evidence of firm resettlement. "Prima facie evidence of an offer of firm resettlement may already be a part of the record of proceedings as testimony or other documentary evidence." *A-G-G-*, 25 I. & N. Dec. at 502 n.17; *see also Firmansjah v. Gonzales*, 424 F.3d 598, 602 (7th Cir. 2005) (applying the burden-shifting framework and finding that government satisfied initial burden by pointing to applicant's "statements on her asylum application and her testimony at the hearing"). Therefore, applying its own framework, the BIA did not abuse its discretion in adopting and affirming the IJ's determination that the Department of Homeland Security presented *prima facie* evidence that the respondent had an offer of firm resettlement before entering the United States.

Second, substantial evidence supports the BIA's conclusion that Hanna firmly resettled in Canada and is therefore ineligible for asylum. We have treated the receipt of permanent residency status in a third country as strongly indicative of firm resettlement. *See Ibrahim v. Holder*, 344 F. App'x 149, 152–53 (6th Cir. 2009) (finding firm resettlement because "[m]ost importantly, [petitioner] received a green card which would have permitted him to remain in [the third country] so long as he remained married"); *Jomaa v. Ashcroft*, 112 F. App'x 427, 429 (6th Cir. 2004) (finding firm resettlement because "factors [including petitioner's asylum application] noted by the

IJ indicate[d] that [petitioner] had an implicit offer of some type of permanent residence"); *Ali*, 237 F.3d at 595 (finding firm resettlement because petitioner was granted asylum in third country upon her arrival, and received a passport and a residency permit); *cf. Garadah v. Ashcroft*, 86 F. App'x 76, 81 (6th Cir. 2004) (rejecting the IJ's finding of firm resettlement because the length of petitioner's stay in third country and temporary residency permits cannot be construed as an offer of permanent resident status). Both Hanna and his father testified to receiving landed immigrant status upon arriving in Canada in December 1991 through Hanna's sister, who is a Canadian citizen.[1] Hanna and his family remained in Canada for a year and ten months before the family came to the United States on visitor's visas in 1993. Hanna stresses that he was a minor when he obtained landed immigrant status in Canada and when he accompanied his family in entering the United States. The BIA found, however, that Hanna maintained his Canadian lawful permanent resident status after becoming an adult and that Hanna frequently traveled between countries until he became eligible for lawful permanent resident status in the United States in November 1998. Because Hanna received lawful permanent residency status in Canada before receiving such status in the United States, substantial evidence supports the IJ's and BIA's findings that Hanna firmly resettled in Canada. *See Xiaomei Xu v. Gonzales*, 238 F. App'x 312, 313 (9th Cir. 2007) ("Substantial evidence supports the IJ and BIA's findings that [petitioner] is firmly resettled in Canada . . . because [petitioner] admitted that she received 'landed immigrant' status in Canada approximately eight years before her most recent entry into the United States.").

Hanna contends, however, that he qualifies for the exception to the firm resettlement bar under 8 C.F.R. § 1208.15(a), which clarifies that an alien is not firmly resettled in another country if "his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not

_____

[1] "Landed immigrant" status, although no longer employed in Canadian immigration law, refers to Canadian lawful permanent resident status. *See Bajwa and Minister of Public Safety and Emergency Preparedness*, [2011] F.C. 192, para 8 (Can. Que.).

establish significant ties in that country." 8 C.F.R. § 1208.15(a). Hanna argues that he remained in Canada only as long as necessary to join his parents in the United States and that he remained in the United States in violation of law for the majority of the time from 1993 to 1998. Indeed, the decision that Hanna would accompany his family to the United States in 1993 was made by Hanna's father. The BIA, adopting the IJ's explanation, found that Hanna did not qualify for the exception. The IJ found sufficient evidence to refute the notion that the family only intended to remain in Canada only as long as necessary to make further travel arrangements. *See* 8 C.F.R. § 1208.15(a). This evidence included findings that Hanna's family started a business in Canada; that Hanna and his father traveled to the United States for a wedding in 1991 and were allowed to return to Canada; that Hanna attended middle school and church in Canada; and that Hanna has a sister who is a Canadian citizen living in Canada. Therefore, substantial evidence supports the finding that Hanna's stay in Canada from 1991 through 1993, as well as his intermittent travels to Canada through 1998, exceeded that which is "necessary to arrange onward travel." *See* 8 C.F.R. § 1208.15(a); *see also Ali*, 237 F.3d at 595–96 (finding asylum applicant did not qualify for an exception since she "did not remain as long as necessary to arrange onward travel" and "clearly established significant ties in Denmark" (internal quotations omitted)). The BIA did not abuse its discretion in affirming the IJ's finding that Hanna does not qualify for an exception to the firm resettlement bar under 8 C.F.R. § 1208.15(a).

In the alternative, Hanna argues that because his claim for asylum occurred well after he obtained permanent resident status in Canada and in the United States, the firm resettlement bar does not apply. Hanna obtained landed immigrant status in Canada in November 1998, lawful permanent resident status in the United States in July 2003, and then applied for asylum based on his fear of persecution as a Chaldean Christian in May 2010. Hanna observes that since he did not seek asylum based on his fear of persecution as a Chaldean Christian until nearly a decade after he acquired lawful permanent resident status in the United States, the relevant time period for the firm resettlement analysis has been reset. Hanna contends that when the fear of persecution does not arise until after an asylum applicant is resettled in the United States, the intervening acquisition of lawful

status in a third country does not trigger the firm resettlement bar. The BIA rejected this argument, concluding that the denial of asylum is required for anyone who has firmly resettled before arriving in the United States, regardless of when the fear of persecution arose. The government additionally responds that the firm resettlement bar applies to Hanna because his circumstances fit within the plain language of both 8 U.S.C. § 1158(b)(2)(A)(vi) and 8 C.F.R. § 1208.15. The government contends that the statute and regulation concern an asylum applicant's contacts with a third country "prior to" entering the United States, not the reason the alien entered that third country. *See* 8 U.S.C. § 1158(b)(2)(A)(vi).

Hanna's argument fares no better now than it did before the BIA. Determinations of firm resettlement depend on an alien's contacts with a third country prior to entering the United States. The statute is unambiguous on this point and contains no suggestion that events occurring after an alien enters the United States have any bearing on whether the alien had previously firmly resettled in a third country. *See* 8 U.S.C. § 1158(b)(2)(A)(vi) (providing ineligibility for asylum if "the alien was firmly resettled in another country prior to arriving in the United States"). This interpretation is buoyed by Sixth Circuit case law. *See Ali*, 237 F.3d at 596. In *Ali*, petitioner was granted refugee status by Denmark, and upon arrival in that country she received a Danish passport and a residence permit. *Id.* at 595. Subsequently, petitioner allowed her Danish passport to expire. *Id.* at 593. Danish authorities confiscated the passport and informed her that she no longer had refugee status. *Id.* As a result, petitioner argued that the BIA erred in finding that she had firmly resettled in Denmark. The *Ali* court rejected petitioner's argument, noting that "'[t]he pertinent regulations specifically focus on resettlement status *prior to* the alien's entry into this country.'" *Id.* at 596 (alterations in original) (quoting *Abdalla v. INS*, 43 F.3d 1397, 1400 (10th Cir. 1994)); *see also Tchitchui v. Holder*, 657 F.3d 132, 136–37 (2d Cir. 2011) (rejecting petitioner's argument that the IJ and BIA erred in determining petitioner did not qualify for § 208.15(a) exception by considering his ties to third country extant prior to persecution giving rise to petitioner's asylum application). Applying the plain text of the statute and the principle noted by the *Ali* court, the fact that Hanna's claim for asylum arose after

acquiring lawful permanent residence in the United States does not affect whether Hanna was firmly resettled in Canada before entering the United States.  Nor do we believe that Hanna's contention that his Canadian permanent resident has lapsed after entering the United States alters the conclusion that he was firmly resettled in Canada before entering the United States.  *See* Immigration and Refugee Protection Act of Canada, S.C. 2001, c. 27, §§ 28, 41(b) (Can.).   Since substantial evidence supports Hanna's firm resettlement in Canada prior to entering the United States, he is ineligible for asylum. *See* 8 U.S.C. § 1158 (b)(2)(A)(vi); *see also Sall v. Gonzales*, 437 F.3d 229, 233 (2d Cir. 2006) ("The United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn.").

## IV.

For the foregoing reasons, we grant Hanna's petition for review, reverse the BIA's holding that Hanna's admission is binding, and relieve Hanna of his attorney's 2003 concession of removability.  Because the BIA's determination that Hanna is removable is predicated upon this concession of removability, we reverse that determination.  We remand to the BIA to decide, consistent with the reasoning provided above, whether Hanna's specific offense under Mich. Comp. Laws § 750.82 is a CIMT and whether he is removable without giving his attorney's 2003 concession binding effect.  Separately, we affirm the BIA's conclusion that Hanna is ineligible for asylum.